UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE

Eastern District of Kentucky
FILED
NOV 21 2005
AT PIKEVILLE
LESLIE G. WHITMER
CLERK U S DISTRICT COURT

CIVIL ACTION NO. 05-21-GWU

VIOLA FYFFE,                                                    PLAINTIFF,

VS.                   **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,            DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her application for Disability Insurance Benefits (DIB). The appeal is currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial review of Social Security disability benefit cases:

1. Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2. Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3. Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to Step 4. If no, the claimant is not disabled. See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

1

Fyffe

4. Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. See 20 C.F.R. 404.920(d), 416.920(d).

5. Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6. Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. See 20 C.F.R. 404.1520(e), 416.920(e).

7. Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to

2

support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1)

3

whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford

4

or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

5

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency

6

may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Viola Fyffe, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of morbid obesity, hypothyroidism with fatigue and lack of energy, arthritis of her back and various joints, psoriasis/skin rashes (in the scalp, arms, hands, and thighs), farsightedness, and chronic dysthymia with a Global Assessment of Functioning (GAF) score of 65. (Tr. 14). Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that Mrs. Fyffe retained the residual functional capacity to perform a significant number of jobs existing in the economy and, therefore, was not entitled to benefits. (Tr. 19-20). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ had asked the VE whether a person of the plaintiff's age, education, and work experience could perform any jobs if she were limited to "light" level exertion, and also had the following non-exertional impairments. She: (1) could stand and walk four hours in an eight-hour day (no

more than 30 minutes without interruption), and sit for six hours (no more than one-hour without interruption); (2) could do no sustained or repetitive overhead lifting, reaching, pushing, or pulling with the upper extremities; (3) could never climb high ladders, hills, or slopes, or work at unprotected heights; (4) should not work in the vicinity of, nor operate, heavy moving machinery, mobile equipment, or otherwise be exposed to excessive floor vibrations, jarring, jolts, or jostling; (5) could not do regular operation of foot controlled (pedal-activated) equipment; (6) could only occasionally climb stairs, steps, or ramps, bend, stoop, crouch, squat, or kneel; (7) should not be exposed to excessive noise and should be permitted to wear hearing aids/protective gear devices as appropriate; (8) should be permitted to wear corrective eyeglasses as desired; and (9) would have no less than a "limited but satisfactory" ability to make all occupational, performance, or personal-social adjustments. (Tr. 292-4, 296). The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies. (Tr. 295-6).

On appeal, this Court must determine whether the administrative decision is supported by substantial evidence.

Mrs. Fyffe alleged disability due to a wide variety of problems, including arthritis, inflammation of the sciatic nerve, an unstable thyroid, bladder problems, hypertension, fibromyalgia, psoriasis, right shoulder pain, right hip pain, poor hearing

8

out of her right ear, poor vision which required her to wear glasses, fatigue, and depression. (Tr. 71, 260-3, 267, 270-1, 281-5). She felt her biggest single limitation was not being able to drive without unexpectedly falling asleep, but her doctors did not know the cause of the problem, and a sleep study had shown that she did not have sleep apnea. (Tr. 283, 288).

The only examining source who gave specific functional restrictions was Dr. Bobby J. Kidd, who conducted a consultative physical examination of Mrs. Fyffe on December 16, 2002 (Tr. 206). He noted that she was alleging disability due to pain in her right hip and elbow, and that her weight was 306 pounds at a height of five feet eight inches. (Tr. 207). Her vision was tested as 20/50 in the right eye and 20/40 in the left eye with glasses. (Id.). She had a normal gait, no ambulatory aid was needed, and she appeared stable at station and comfortable in the supine and sitting positions. (Id.). She could also hear and understand normal voices without difficulty, was able to write and pick up coins without difficulty, had a normal range of motion of the shoulders, elbows, and wrists with no swelling, normal feet and ankles, a non-tender spine with no spasm, and forward flexion to 90 degrees. (Tr. 208-9). She could stand on one leg at a time without difficulty, her hips had no tenderness, swelling, or crepitus and a normal range of motion. (Tr. 209). Her neurological exam was normal, she could walk on her heels and toes, perform a tandem gait, and squat without difficulty. (Tr. 209-10). Dr. Kidd listed his

impressions as morbid exogenous obesity and complaints of low back pain. (Id.). In his opinion, Mrs. Fyffe could lift up to 50 pounds occasionally and 35 pounds frequently, stand for six hours in an eight-hour day (no more than 30 minutes without interruption), would have no limitation on sitting, and would be limited to "occasionally" climbing, balancing, stooping, crouching, kneeling, and crawling. (Tr. 211-13).

The only other specific restrictions made by an apparent examining medical source were included <u>indirectly</u> through the notes of a vocational evaluator at the Carl D. Perkins Rehabilitation Center. The notes refer to an assessment by Dr. Scott Mirani on November 14, 2001, which reportedly restricted the plaintiff to light level exertion and standing or sitting eight hours a day with a break every two hours. (Tr. 217). Postural activities may also have been limited to an occasional basis, although the wording of the report is unclear. (Id.). In either event, the ALJ's hypothetical question is consistent with these limitations.

A state agency reviewer, Dr. James Ramsey, reviewed some of the evidence and opined on November 19, 2001 that the plaintiff could perform medium level exertion with no other restrictions established (Tr. 179-87).

Otherwise, although there is an indication in the notes of an orthopedic surgeon, Dr. Gary Bray, that he did not "think she can go back to work" in August, 2001, this vocational conclusion was tentative, and he did not suggest any

10

activity restrictions. (Tr. 148). He had been examining the plaintiff for complaints of tenderness in the right hip and elbow, but hip x-rays were mostly unremarkable with well-preserved joint spaces, and the right elbow x-rays showed only a minimal chip which Dr. Bray felt was of no long-term consequence. (Id.). There was some narrowing of the L5-S1 joint space. (Id.). He opined that her problem was "mostly inflammatory," and would best be treated by a rheumatologist. (Id.). Therefore, he referred the patient to Dr. Paul Goldfarb.

Dr. Goldfarb saw the plaintiff on two occasions, noting her complaints of back and hip pain, weight gain, and psoriasis. (Tr. 203-4). His physical examination showed that Mrs. Fyffe was in no acute distress, although she was morbidly obese, weighing 304 pounds at a height of 68 inches. (Tr. 204). She was able to rise from a chair without difficulty, and while her gait appeared antalgic, she did not complain of pain, and had normal heel and toe walking, although she complained of sacroiliac pain when walking on her heels. (Id.). She could bend forward at the waist more than 90 degrees and came within five inches of touching the floor, with only localized sacroiliac pain. (Id.). Extension and lateral flexion were also normal, her joints were stable and had a full range of motion, her grip and flexion were normal, she had normal lower extremity strength, and 90 degrees of straight leg raising. (Tr. 205). Fourteen of a possible 18 points were tender, particularly in the gluteal area. (Id.). X-rays of the hips and right elbow were largely normal. (Id.). Dr. Goldfarb listed his

11

impressions as fibromyalgia, low back pain, morbid obesity, hypothyroidism, controlled hypertension, and psoriasis. (Id.). He obtained laboratory work which was reported as normal. (Id.). The physician prescribed Salsalate, an anti-inflammatory medication, and Doxepin for sleep. When Mrs. Fyffe returned in March, 2002 it was noted that she was remodeling her basement, and could not "find employment." (Tr. 202). Dr. Goldfarb's impression was that the plaintiff's fibromyalgia was a "significant problem," and he also listed impressions of medial epicondylitis, chest wall pain, and "abnormal x-rays per patient." (Id.). He changed Doxepin to Trazodone and continued Salsalate, and recommended that the plaintiff go to physical therapy for "fibromyalgia exercises" as well as for treatment of her right elbow. (Id.). On March 19, 2002, he apparently reviewed x-rays from Dr. Bray which were read as showing marked degenerative joint disease at L5-S1, and some sclerosis of the right sacroiliac joint. (Id.). No functional restrictions are given, and no further records from this source were submitted.

The plaintiff's treating family physician, Dr. Rondal Goble, submitted brief office notes showing that Mrs. Fyffe was given injections prior to her alleged onset date for left shoulder impingement, with good results. (Tr. 125-6). She also complained of right hip pain and mild back pain in July, 2001, approximately the time of her onset date, and was referred to Dr. Bray. (Tr. 123). In November, 2001, the plaintiff reported that her shoulder pain had improved, although she continued to

12

have problems with low back pain and "hurting all over." (Tr. 241). The physician noted that she continued to be "unable to perform her duties as a hairdresser" (Id.), which was consistent with the ALJ's deterimination of an inability to return to past relevant work. She continued to be treated for transient conditions, as well as the shoulder problems and sacroiliitis, and was diagnosed with plantar fasciitis after complaints of heel pain in 2002. (Tr. 238-9). Dr. Goble referred his patient to a podiatrist, who performed cortisone injections into both feet with "significant relief." (Tr. 237, 246-7). At the last reported visit to Dr. Goble, in February, 2003, the plaintiff reported having a great deal of stress in her family and not sleeping well, but also stated that she had stopped taking Prozac, which the physician had been prescribing for many years. (Tr. 235).[1] Dr. Goble did not suggest any functional restrictions.

The only mental evaluation was conducted by Dr. William Rigby in July, 2002, and he concluded that the plaintiff's most serious problems appeared to be physical. He diagnosed dysthymia, and completed a mental residual functional capacity assessment which was adopted by the ALJ and given in the hypothetical question to the VE, supra. (Tr. 198-9).

---

[1] The plaintiff stated at the November 1, 2002 administrative hearing that she had been taking Prozac for approximately six years before filing for disability, since about 1995. (Tr. 267).

13

Fyffe

The plaintiff's arguments on appeal are that the ALJ failed to mention several of her conditions in his opinion, namely the diagnosis of fibromyalgia, sleep apnea and narrowing of the spine at L5-S1. As the Commissioner points out in reply, the ALJ actually did mention spinal narrowing and sleep apnea. (Tr. 14-15, 18). As previously noted, the plaintiff's testimony was that testing had ruled out sleep apnea and that she was just a restless sleeper. (Tr. 283). Although there are references to sleep difficulties in some office notes (e.g., Tr. 205, 239-40), no functional restrictions are suggested, much less proven. Likewise, the physicians who had access to the x-rays showing spinal narrowing did not suggest any specific functional restrictions. (Tr. 148, 202). The mere diagnosis of a condition does not establish resultant functional restrictions. Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988).

Given Dr. Goldfarb's finding of tender points and listing of "fibromyalgia" as a condition, along with his notation that it was a "significant problem" (Tr. 202, 205), the ALJ did err in failing to discuss the condition. However, under the circumstances of this case, the error was harmless. The Sixth Circuit has noted that fibromyalgia or fibrositis is a real condition, but a diagnosis of the condition does not result an automatic finding of disability. See Preston v. Secretary of Health and Human Services, 854 F.2d 815, 819-20 (6th Cir. 1988). It is still the plaintiff's responsibility to prove functional restrictions. Since neither Dr. Goldfarb nor any other source identified specific functional restrictions, the plaintiff still failed to carry her burden in

14

Fyffe

this regard, and a remand would not change the result of the case. <u>Wilson v. Commissioner of Social Security</u>, 378 F.3d 541, 547 (6th Cir. 2004).

The decision will be affirmed.

This the __/8__ day of November, 2005.

_____
G. WIX UNTHANK
SENIOR JUDGE